## LAVERTY *vs.* MOORE and others.

In 1835 L. and G. entered into an agreement in writing, by which L. undertook to fill in with earth, &c., certain lands under water, owned by G., and as a compensation for the labor, G. covenanted to convey to L. one-third part of such lands, in fee. L. proceeded to fill in the lots, having previously made a survey of the same, in which he was aided by T., the then owner of the adjoining lots on the south. On such survey T. placed stakes, and made a monument, to indicate the boundary line between him and L., and L. filled in the lots to correspond with the stakes and monument. T. was repeatedly upon the ground, while the work was in progress, and made no objection thereto. *Held,* that the line between the two adjoining owners being thus established, and located by the acts and acquiescence of the parties themselves, and L. having expended money and labor in making valuable and permanent improvements upon the lots, in the faith and confidence that the line so marked was the true line, it must be regarded as such; and that persons claiming title under T. were estopped from controverting the line as thus established and located.

Where a bill of foreclosure stated that a portion of the mortgaged premises had been released from the operation of the mortgage, by the mortgagee, and that the mortgage was not a lien thereon; and the decree excepted that portion from the effect of the decree of foreclosure; but the master's deed, through inadvertence, embraced the whole mortgaged premises; it was *held,* that the premises released did not pass to the purchaser at the master's sale, and that the deed had no effect whatever upon the title of the true owner of the premises released.

L. entered into possession of lots, under an agreement in writing between him and G., by which it was stipulated that L. should fill in the same and other lots owned by G., and that in consideration thereof G. should, on the completion of the work, convey to L. one-third of the lands, in fee. L. caused his agreement with G. to be recorded in the county clerk's office, and continued in possession after the completion of the work. *Held,* that although the agreement was not a conveyance, within the meaning of the recording act, yet that it tended to show the character of L.'s possession; that such possession, under claim of title to a deed from G., was notice to subsequent mortgagees and others, of his interest and claim; and that the lien of a subsequent mortgage given by G. was subject to L.'s right to a deed, under his contract.

THIS was an appeal by the defendant from a judgment entered upon the report of a referee.

*William Fullerton,* for the plaintiff.

*D. McMahon,* for the defendants.

*By the Court,* BROWN, J.   This is an action to enforce the specific performance of a contract for the sale and conveyance of an interest in a lot of land in Williamsburgh, now the city of Brooklyn, and to be let into the possession thereof.  The contract under which the plaintiff claims bears date February 9th, 1835, but no question is made upon the statute of limitations ; nor do the defendants defend themselves upon the ground of bona fide purchase without notice.  The right of the plaintiff to recover depends solely upon his equitable title to the premises claimed.  The action was tried before William Kent, Esq., referee, who made a report in favor of the plaintiff, upon which he entered judgment, and the defendant appealed.   I shall refer briefly to the three principal questions involved in the controversy.

The lands were originally below high water mark, and flowed by the tide waters of the East river.  Francis Titus owned the lands upon the shore, with a bulkhead or wharf extending a short distance into the water.  But it does not appear that he had any title from the state to the lands below high water mark as the waters flowed at the time of his conveyance, to which I shall refer.  On the 10th of May, 1828, by his deed of that date, he conveyed a portion of his lands to one Noah Waterbury, in fee.   This land was bounded upon the westerly side by the river, and included such right as he then had to the lands under the waters of the river. It was bounded, as I understand, on the north and south by lands of which Titus still remained the owner, being the residue of a large or very considerable farm of land ; opposite this land was the bulkhead, which was in use, or had been used as a landing place.   On the 5th of November, 1832, Noah Waterbury conveyed the same premises to James M. Halsey, who on the same day, by his deed, conveyed them to James Guild.   By an act of the legislature of the state, passed April 22, 1835, James Guild and others were authorized to erect and maintain docks and wharves adjacent to the land owned by them in Williamsburgh, lying in the East

river, and extending into the river to a line designated upon a map of the river, made in February, 1835, by D. Ewen, city surveyor, &c. Such docks and wharves were to extend along the front of their lands and be made firm and secure. It was in anticipation of this grant of the lands under water that James Guild, on the 9th of February, 1835, by articles of agreement of that date, duly executed under seal, entered into the contract with James Laverty, the plaintiff, which is the foundation of this action. By this contract Laverty undertook to fill in with earth and material the lands in controversy, "bounded therein northerly by the southerly side of North 6th street, to the East river; thence to and along a line drawn from the center of North 6th street where the same strikes the East river, said line following the direction of said street until it strikes and runs to the westerly side of the logs lying in the East river designed for a bulkhead; southerly by the line which divides the property formerly of James Guild and Francis Titus; westerly by the westerly side of the logs aforesaid; easterly said piece of ground runs to a point 134 feet westerly from First street, on the southerly line of North 6th street." The filling in was to be completed according to a profile, and of a height to correspond with the grade of North 6th street. As a compensation for the work, Guild covenanted to convey to Laverty in fee simple by deed, with covenant of warranty, the one-third part of such lands. In laying out North 6th street, a small gore or triangular shaped piece of Guild's land was left on the southerly side of the street. The base of this gore or triangle was the original high water mark, and was 5 feet 6 inches in length. The north or shortest of the two sides was the south side of North 6th street, and was 16 feet in length, and the hypothenuse or longest side was the old boundary line between Francis Titus and Noah Waterbury. The gore or triangular lot, one-third of which is awarded to the plaintiff by the referee, has a base of 81 feet 6 inches, with the hypothenuse 262 feet 10 inches in length, and the

side along the south line of North 6th street 256 feet 6
inches in length.    This enlargement of the area of the lot at
the western end is obtained by projecting or continuing the
old boundary line between Titus and Waterbury in the same
course into the East river.    The appellants claim that in
running the line in this direction the referee committed an
error; insisting that the whole of the old exterior line and
the whole of the new exterior is to be ascertained and taken
into consideration, in awarding to each proprietor his due
share of the new water front.    Upon this theory the south-
erly line of the lot in which the referee awarded the plaintiff
a share should begin at the south end of the 5 feet 6 inches
line—the base line of the gore, as originally left by the open-
ing of North 6th street—and from thence run westerly
on a line parallel with the south side of North 6th street to
the new exterior line in the East river; thus making the lot
5 feet 6 inches in width from north to south, and 256 feet
6 inches from east to west.    The real question in controversy
upon this branch of the case, it is to be observed, is the ques-
tion of the location of the south line of the lot.    The referee
has found some facts from the evidence which must have
the effect to control the location, and to fix it irrevocably upon
a line corresponding in its course and direction with the old
boundary line between Titus and Waterbury.    I refer to the
following portion of his report: "That when Laverty com-
menced filling in the gore he made a survey of the same, in
which he was aided by Francis Titus.    That at such survey
Titus placed stakes at the southerly side of the gore, as the
same was then located and filled in by Laverty.    He also cut
what is called by the witnesses a crowfoot, in one of the old
dock logs forming the old bulkhead, as a monument for the
extreme southwesterly corner of the gore; which stakes and
mark are shown by the map annexed to the report.    That
Laverty filled in the lot to correspond with the stakes and
mark upon the old dock.    That Titus was the owner of the
land upon the southerly side of the gore at the time the

Laverty *v.* Moore.

survey was made and the work of filling in done, and was repeatedly upon the ground while the work was in progress, and made no objections thereto." Francis Titus died in 1837, leaving one child, Cornelia Phelps, wife of Simon Phelps, surviving him. The defendants, James Moore and William Leeds, now hold the land on the southerly side of the gore, directly or indirectly by lease from Phelps and wife. The legal inference is that their title is derived from Francis Titus. With these facts sustained by the proofs, the defendants are estopped from controverting the line as established and located by Frances Titus and James Laverty the plaintiff. We are not now to consider the rights of riparian owners to lands reclaimed from the waters of a navigable river under grants from the state; nor to say how the exterior lines are to be adjusted with reference to the lines upon the original river bank. The rights of the parties do not depend upon the application of this principle. The line in question must be regarded as settled by the acts and acquiescence of the owners upon both sides of the line. They surveyed and marked it out. Laverty expended his money and labor in making valuable and permanent improvements upon the lot, upon the faith and confidence that the line so marked was the true line. He reclaimed the lands from the tide water of the river, and by his improvements rendered them fit for occupation, and imparted to them if not all at least the principal part of their value. And it would be manifestly unjust to award them to another. The law will not lend its sanction to such an act.

On the 5th November, 1832, when James M. Halsey conveyed the lands to James Guild, the latter executed to the former his mortgage upon the same, to secure the payment of $10,250, being a part of the purchase money. In May, 1837, Guild, by his deed of assignment, conveyed the premises purchased from Halsey to Edmund Frost and John Luther, by his deed of assignment, in trust for the payment of debts. On the 12th of August, 1837, Halsey, by his deed

of release, executed to Frost and Luther, and for the consideration expressed therein of one dollar, released the gore of land in which Laverty had an interest from the lien of his mortgage, and agreed therein to look to the residue of the mortgaged premises for the payment of the money due thereon.

The legal representatives of Halsey afterwards foreclosed the mortgage by bill in the late court of chancery, and made Laverty a party defendant thereto. The bill of complaint stated the release of the gore, and that the mortgage was not a lien thereon. The decree of sale excepted the gore from the effect of the decree. At the sale, James M. Waterbury became the purchaser; and the deed which the master delivered to him in execution of the decree included the gore, with the residue of the mortgaged premises. Waterbury, on the 3d September, 1846, by his deed of that date, quitclaimed the gore to the heirs at law of Samuel Meeker, deceased, to wit: Martin R. Meeker, John F. Meeker, Sands C. Meeker, Maria Sandford, Sarah Ann Meeker, and Catherine Meeker, who are defendants herein. It requires no argument to show that the master's deed did not convey the gore in which Laverty had an interest. It could not convey premises which the bill of complaint did not claim, and of which the decree did not authorize or direct a sale. It was an inadvertence on the part of the master in not having his deed follow the decree, and had no effect whatever upon the title of the true owner.

The remaining question arises upon the effect of the mortgage executed by Frost and Luther to James M. Halsey on the same day that he executed to them the release of the gore. This mortgage is made to secure the payment of $1582, purporting to be the consideration money for the release, and conveys the gore as security therefor. The deed of assignment from Guild to Frost and Luther was upon the express trust to sell for the payment of debts, and their power to execute the mortgage is by no means free from doubt. But the question may be disposed of upon other grounds.

Laverty *v.* Moore.

On the 11th August, 1836, which was before the date of the deed of assignment to Frost and Luther, Laverty had caused his agreement with Guild to be recorded in the office of the clerk of the county of Kings, and although not a conveyance within the meaning of the recording act, tended to show the character of his possession. The referee finds, as a fact in the case, that the plaintiff was in possession of the gore, claiming an interest therein from the time of the completion of his contract to fill in the lot, sometime in the year 1836 or 1837, up to May, 1843, when a part of the premises were taken possession of by one Grahams Polley. In his own evidence, the plaintiff says, he went into possession about a year before he had the article of agreement with Guild. He commenced filling in a month before the article was dated, and it took him a year to complete the work. He kept possession until about a year after Polley drove his piles. Laverty's possession was notice to James M. Halsey and all others of his interest and claim to the gore of land, and the lien of the mortgage was subject to Laverty's right to a deed for one third part thereof, under his contract with James Guild. James M. Halsey assigned the mortgage to Samuel Meeker, who foreclosed the same by bill in the late court of chancery, filed November 16th, 1841, and under these proceedings Samuel Meeker himself became the purchaser and acquired the title under the master's deed. James Laverty was not made a party to these proceedings, although he was in the actual possession of the premises at the time, and is no way prejudiced or affected by them.

For these reasons I concur with the referee in his opinion, that the plaintiff is entitled to a conveyance in fee simple from the defendants for an undivided third part of the premises mentioned and referred to in the contract, and to be let into the possession thereof. The judgment should be affirmed with costs.

[ORANGE GENERAL TERM, September 10, 1860. *Lott, Emott* and *Brown,* Justices.]